OTT, Chief Judge.
We reverse the hearing officer’s order releasing appellee from continued involuntary placement in the appellant’s treatment facility.
Appellee, a 22 or 23-year-old young man at the time of the hearing below, was involuntarily placed in appellant’s treatment facility on January 17, 1982, pursuant to a December 15, 1981, order of the Circuit Court of Volusia County. Apparently, the Division of Administrative Hearings conducted an initial hearing shortly following appellee’s placement and entered an order that appellee’s involuntary placement continue “for a period not to exceed ninety (90) days from March 15, 1982.” Involuntary placement of appellee would therefore terminate on or about June 13, 1982.
Under section 394.467(4), Florida Statutes (1981), the administrator of a treatment facility that has been ordered by a court to receive and treat a person must request an order for continued involuntary placement where the administrator has reasonable cause to believe the patient meets either of the two criteria for original involuntary placement under section 394.467(l)(b). If the hearing on the request shows either of such criteria to continue, then the hearing officer is mandated to enter an order of continuation.
On or about May 15, 1982, appellant requested the order of continuation, attaching the required mental health professional’s brief summary of appellee’s treatment, history, plan of treatment, and justification for requesting the order of continuation. A hearing was held June 15, 1982.. Two witnesses testified, one being the mental health professional involved in the treatment and evaluation of appellee, and the other being appellee. Appellee was represented by counsel at the hearing below and on this appeal.
Appellee conceded at the hearing that he was mentally ill, that he required treatment, and that the witness, Dr. Moorehead, was a qualified mental health expert. Therefore, there remained for determination by the hearing officer only the question of whether appellant had presented clear and convincing evidence[1] of either of the following statutory criteria for involuntary placement:
*653 394.467 Involuntary Placement.—
(1) CRITERIA.—
* * * * * *
(b) Any other person may be involuntarily placed if he is mentally ill and, because of his illness, is:
1. Likely to injure himself or others if allowed to remain at liberty, or
2. In need of care or treatment which, if not provided, may result in neglect or refusal to care for himself, and such neglect or refusal poses a real and present threat of substantial harm to his well-being.[2]
On the first criterion — that the ap-pellee was dangerous to himself or others— the hearing officer found that appellant had failed to carry the burden of proof. Although Dr. Moorehead gave detailed and unqualified testimony that appellee was dangerous to himself or others, the hearing officer found to the contrary. He based such finding on Dr. Moorehead’s testimony that there had been no threat or overt act by appellee against any patient or staff member of the hospital; that appellee had never actually harmed another and that appellee’s frequent threats of suicide or to harm his parents on release was at least partially out of frustration. The hearing officer also chose to believe appellee that he only “intended to hurt them (emotionally), but he has never intended to carry through on the threats. If released, he would not return to their home to live.” While we have serious reservations about the sufficiency of such evidence to rebut the unequivocal and well supported testimony of Dr. Moorehead, we reluctantly conclude that there was sufficient evidence other than appellee’s explanation to support the hearing officer’s finding.
On the second criterion (§ 394.-467(l)(b)2), the prior history of appellee from age twelve demonstrated repeated failures of appellee to voluntarily follow any course of recommended treatment or continue professional care except when hospitalized or under the duress of potential prosecution for obscene telephone calls or other offense. He never considered himself really ill or that treatment was necessary. His history prior to the immediate hospitalization showed repeated promises not to make any more obscene telephone calls, not to make any more threats, to get or keep a job, to seek or continue treatment, and he had consistently failed to do any of these. The ensuing deterioration, withdrawal, regression, and acute illness of appellee was clear. The appellee offered no contradiction or qualification of his prior history.
As to his current attitude or condition, Dr. Moorehead testified as follows:
No, I don’t think he would be able to sustain the treatment, or especially work within the treatment, work with a helping person, basically because for one, he doesn’t really see that he has anything really significantly wrong ... he doesn’t understand what it is that is dysfunctional about his behavior, and also, when it comes time for painful recognitions or working through things that are extremely painful for him ... Chris’ defense is to flee, and to refuse to recognize this. We have seen, even here at An-clote, that he will recognize something and then just become extremely angry, paranoid, defensive, as though he had never said what it was that he said.
On cross-examination, Dr. Moorehead stated that “the inability to take care of himself, I would say, is extremely high — getting close to 90%.”
The only evidence in the least contrary was the testimony of appellee on the following examination by his- own counsel:
RAHDERT [Appellee’s attorney]: And, you have also heard Dr. Moorhead [sic] give testimony this morning that she does not think that if you were released from this hospital you would seek any sort of assistance ... psychological counseling
SADLER [Appellee]: Yes, I would. Definitely.
*654 RAHDERT: Do you need help?
SADLER: I need help, yes, but I don’t need to be locked up like this . .. I’m not a dangerous person. I’m not going to hurt anyone. I haven’t hurt anyone in 23 years, or myself in 23 years, but I do want help. I don’t want to be locked up like this.
RAHDERT: How would you seek that help, Chris.
SADLER: Well, I think I would take Dr. Dignam’s advice. See a psychiatrist on the outside, one he recommends, and work on it that way.
Appellee further testified that he would get a job somewhere, would live with some friends somewhere, and would “take care of myself” somehow. The parents of appellee did not want appellee living in their home out of fear for their own safety.
Appellee did not offer the testimony of or even the name of any mental health professional or health care facility that would accept him for care on release, nor the testimony or name of any person with whom he would live and who was willing to assume responsibility, nor the testimony or name of any person who would give him a job.
We hold that there was no substantial competent testimony to rebut the unrefuted evidence presented by appellant through Dr. Moorehead that appellee was “[i]n need of care or treatment which, if not provided, may result in neglect or refusal to care for himself, and such treatment or refusal poses a real and present threat of substantial harm to his well-being.” § 394.467(l)(b)2, Fla.Stat. (1981). Hence, appellee continues to meet the criteria for involuntary hospitalization, and further, he has failed to show the existence of a concrete, less restrictive alternative to hospitalization. See In re Smith, 342 So.2d 491 (Fla.1977).
We therefore REVERSE the order and REMAND for further proceedings wherein additional and meaningful evidence may be presented by both parties as to the existence and viability of some less restrictive alternative. See In re Smith.
DANAHY and CAMPBELL, JJ., concur.

. In re Beverly, 342 So.2d 481 (Fla. 1977).

. This statute was amended by chapter 82-212, section 12, Laws of Florida (1982), effective October 1, 1982. The revised statute was not applicable to this June 15, 1982, proceeding.